## Case No. 15,999.

### UNITED STATES v. PARROTT et al.

[1 McAll. 447.] [1]

Circuit Court, N. D. California. Jan. Term, 1859.

EQUITY PRACTICE — COMMISSION TO TAKE TESTIMONY ABROAD—NOTICE—STATE AND FEDERAL COURTS.

1. A motion for the appointment of commissioners to take testimony abroad, is not grantable of course.

2. Special motions, unlike those grantable of course, require allowance by the judge, and previous notice to the adverse party.

3. The power to grant a dedimus potestatem, is given to the federal courts, to prevent the failure of justice, to be exercised according to "common usage."

4. Where motion is made to a court of equity, the usages and rules of chancery must apply.

5. The practice and jurisdiction of this court, as a court of equity, cannot be controlled by the practice of the state courts.

6. The materiality of the testimony, and the purposes for which it is invoked, will determine the action of the court.

Application for a dedimus potestatem to take testimony abroad. [An injunction pendente lite was heretofore granted. See Case No. 15,998.]

P. Della Torre, U. S. Dist. Atty.

Edmund Randolph and Edwin M. Stanton, for complainants.

A. C. Peachy, Gregory Yale, and Hall McAllister, for defendants.

McALLISTER, District Judge. In this case a bill was filed by the district attorney,

[1] [Reported by Cutler McAllister, Esq.]

of the United States, in behalf of the government. Among other matters. it alleged that the title to the premises in dispute was in the United States; that defendants had taken tortious possession of them; that they consisted of a mine of great value; that defendants had extracted minerals therefrom to the value of $8.000,000; that they were extracting therefrom minerals to the annual amount in value of $1,000,000, and threaten to continue the waste; that they were unable to respond for the damages which had already accrued, and which would still accrue; that the defendants, in the name of one Andres Castillero, had presented a petition to the "board of land commissioners." under the act of congress approved March 3, 1851 [9 Stat. 631], which was pending on appeal from the decision of the commissioners, before the district court of the United States for the Northern district of the state of California, the object of which petition was to obtain from the United States a confirmation of the title which they pretended to hold from the Mexican government; that the title under which they held possession was forged, ante-dated, and fabricated in pursuance of a conspiracy to cheat and defraud the United States of their rights to the said property. The bill concluded by charging that defendants were destroying the substance of the mine, and prayed that an injunction might issue to stay the waste defendants were committing, and threatened to commit. until the determination of their alleged title by the tribunals to which the adjudication of it was confided, and that a receiver be appointed. To this bill an answer was filed, and on the bill and answer the motion for injunction was argued and decided. The charges in the bill specifically made, of forgery, and ante-dating of the documentary title under which defendants held, were not directly and fully denied; all that was averred was the ignorance of defendants of their existence, and their belief of the genuineness of the documents. In relation to the charge made in the bill of a conspiracy to cheat and defraud the United States, after admitting the genuineness of all the letters save one, appended to the bill, the answer, in response to the allegation of conspiracy, denies "that the said letters and communications were written by the said parties with intent to commit a fraud. or in furtherance of a conspiracy to fabricate a title, as charged in said bill, except so far as the said intention appears from said letters on the part of the said James Alexander Forbes." So far, then, as the intention of conspiracy appears from the letters, it was admitted that "Forbes," under whom two of the defendants claimed, may be guilty. In view of the insufficiency of the denials in the answer. the irreparable character of the mischief complained of, and the prima-facie title of the complainants exhibited by the bill, answer, and exhibits, the

court granted the injunction, and refused the appointment of a receiver.

The well-settled rules of chancery require that full. direct, and positive denials should have been given to the charges of fraud, forgery, ante-dating, and conspiracy. This doctrine is enunciated by uniform decisions. Poor v. Carleton [Case No. 11,272]; Clark's Ex'rs v. Van Riemsdyk, 9 Cranch [13 U. S.] 160; Everly v. Rice, 3 Green. Ch. [4 N. J. Eq.] 553; Roberts v. Anderson, 2 Johns. Ch. 202; Apthorpe v. Comstock, 1 Hopk. Ch. 143; Ward v. Van Bokkelen, 1 Paige, 100. Independently of authority, reason and common sense affirm the propriety of the rule. The facts charged in the bill were forgery and ante-dating. These were not denied, but the ignorance of the defendants of their existence and their belief in the non-existence of them averred. In Roberts v. Anderson, 2 Johns. Ch. 202, Chancellor Kent has well said, "The defendants may have given all the denial in their power; but the fraud may exist notwithstanding, and consistently with their ignorance, or the sincerity of their belief."

It has been suggested, that the allegations of the forgery and ante-dating not having been sworn to from personal knowledge, that circumstance should modify the rule. No authority has, nor it is believed can, be invoked to sustain a proposition so novel. The allegations of a bill properly made, which so clearly charge the fraud as to make it perfectly intelligible to the defendants, entitle the complainant to such a denial as is prescribed by the rules of chancery. If such an one is not put in, the defendant cannot arrest the issue of an injunction on the ground that he has filed an answer denying the equity of the bill. Relax that rule, and what might not be the injurious results?

There are many cases in which rights may be violated under circumstances which may warrant an honest belief that atrocious fraud had been perpetrated; but those circumstances may have transpired at a distance from the party, and he unable to swear to them from personal knowledge. Can it be contended with any reason, that when the party comes into a court of equity, that tribunal will award to an answer whose denials of forgery and ante-dating are made "upon information and belief," the character which the law annexes to an answer where the denial of the fraud is on personal knowledge? The allegations of a bill, are mere pleadings; the averments in an answer responsive to them, are regarded as evidence equivalent to two disinterested witnesses, or one witness and strong corroborative circumstances. To consider that the denials of an answer on "information and belief" are to be deemed sufficient because the allegations of the pleadings are not sworn to from personal knowledge, is simply to confound the distinction which exists between pleadings and evidence. So to modify the rule, would

exclude any application by way of information, through its officer, by a government. To every such application an answer on "information and belief" would be sufficient, for personal knowledge of facts is not to be expected from the government. Deeming the rule applicable to this, as it is to all similar cases, the court considered that the denials of the fraud, ante-dating, and forgery were not such as ought to arrest the issue of an injunction; that the case was one of irremediable mischief; and lastly, that the pleadings and exhibits in the case showed a probable foundation to entitle the complainants to be protected against that irreparable mischief, until the determination of the question of title in the tribunal in which it was pending.—this court, without pausing to dwell upon the title set up by defendants, independently of any alleged forgery of it, directed the injunction to issue, but declined for the present the appointment of a receiver. The injunction exists, the issue of title is still pending in the district court, there is no suggestion of any fact that has arisen since the decision of the court to change the relative attitude of the parties from what it was at that time, nor to alter the jurisdiction of the court in any way over the case. That jurisdiction was distinctly enunciated to be confined to granting the prayer of the bill, the court disclaiming at the same time all power to decide upon title, either on a motion to dissolve an injunction, or on a final hearing.

In this condition of things, an application is made to this court to designate commissioners to take testimony abroad. The facts expected to be proved go mostly to the establishment of the title of the defendants, and the genuineness of the documents by which they propose to sustain that title. The avowed object of invoking that testimony, is "to offer it in evidence on the trial of this case, or on a motion to dissolve the injunction which has been granted against the defendants therein, or for any other purpose in said cause to which such evidence shall be applicable." The grounds taken in support of this motion are,—1st. That it is matter of right, grantable of course; 2d. That the materiality of the testimony invoked, whether there is to be any hearing at all in the case, whether the testimony would be hereafter admissible, are all matters to be considered when the evidence is offered, not by anticipation. If the first proposition be correct, the second follows as a corollary from it.

The first ground which claims the action of this court as matter of right, and the granting of the application as matter of course, presupposes the act of the court to be merely ministerial. If this be so, it has no right to investigate whether the testimony be material, or whether it can be used when obtained. All it has to do, is to perform the mere ministerial duty which it is commanded to discharge, and the present application is needless. Whence the necessity of naming witnesses, the facts they are expected to prove, and the purpose for which their testimony is invoked, if this motion is grantable as a matter of course? Both these grounds will be discussed together, for each is involved necessarily in the other; for if the granting a "dedimus potestatem" is matter of course, the court has nothing to do with the materiality of the testimony, the use to be made of it, or any other matter connected with it. If, on the contrary, the power of this court to grant this application depends upon the materiality of the testimony, and the purposes for which it is invoked, it is evident that neither ground can be tenable.

To sustain the proposition that the granting of the present application is matter of right, reference is made to the 67th rule governing equity practice, as amended in 1854, by the supreme court of the United States, and to the 5th section of the act of congress of 22d August, 1843. By the 67th rule it is provided, that after a cause is at issue, commissions to take testimony may be taken out in vacation, as well as in term-time upon interrogatories filed by the party taking out the same in the clerk's office, ten days' notice being given to the adverse party to file cross-interrogatories before the issuing of the commission, &c. And the rule provides that in all cases the commissioners shall be named by the court, or a judge thereof. The amendment to this rule, to be found in 17 How. [58 U. S.] vii., declares that the presiding judge of any court exercising jurisdiction, either in term-time or vacation, may vest in the clerk of said court general power to name commissioners to take testimony in like manner that the court or judge can now do by the 67th rule. The presiding judge of this court has never vested in the clerk any such power. We must look, therefore, to the former rule, the construction of which will necessarily determine the extent of any power which the judge could have delegated to the clerk; for the judge could not have delegated any power which he did not himself possess, and which by the requisitions of the amended rule was to be exercised by the clerk in the same manner as it could be by the judge. The fifth section of the act of 22d August, 1843 (5 Stat. 517), provides, that the district courts as courts of admiralty, and the circuit courts as courts of equity, shall be deemed always open for certain purposes, and that it will be competent for any judge at chambers, and in vacation as well as in term-time, to award all such process, commissions, rules, and proceedings, &c., whenever the same are not grantable of course, according to the rules and practice of the court. It is evident, then, from the act, that all commissions are not granted of course. Looking through the equity rules, it will be found that a distinction is preserved between spe-

cial motions and those grantable of course. What constitutes a motion grantable of course, and a special one, is to be inferred from the 5th rule of equity. The distinction is, that a motion which requires an allowance 'from the judge or a notice to the opposite party is a special one; all others are grantable of course. This motion asks for the interposition of the judge to nominate commissioners, and requires that previous notice of ten days should be given.

In addition to foregoing rules and act of congress, reference has been made to Daniell, Ch. Prac. 1099, where that author discusses the question, what facts are necessary to be inserted in the affidavit on which the application for a commission is founded, and shows it is from the authorities, uncertain whether the names of the witnesses, or a statement of the points to which it is intended to examine them, are necessarily to be given in the affidavit. In relation to the names of witnesses, he states that according to the books of practice all that need be stated in the affidavit is, that the testimony of some of the witnesses whom it is proposed to examine is material, and that the party cannot proceed to trial safely without their testimony. He further states, when the application is made in an early stage of the case the court seldom denies the application for a commission; it will, however, exercise a discretion upon this subject, and he gives various instances where such applications were refused. As to the necessity of stating the facts to be proved, or the names of the witnesses in the affidavit, the conclusion to which he comes, after a review of the authorities, is, that in order to dispense with the necessity of stating them in the affidavit, the names of the witnesses, and the object to which their testimony is required, and the necessity for examining witnesses abroad, must be evident from the pleadings, if not made so by the affidavit; and he distinctly states, that the reason why Lord Eldon, in the case of Montizibel v. Machada, did not require those matters to be stated in the affidavit, was, that his lordship had looked into the case, as made by the pleadings, in order to see whether there were facts to which it was proper to examine the witnesses. The same author tells us, that it must appear that the facts relied on as to which evidence is sought, are such as can be made use of, either in support of the action or in defense of it. Daniell, Ch. Prac. 1096.

The foregoing authorities (all that have been cited by counsel) do not sustain the proposition asserted. There are but two sources of power to which this court can look for its action to obtain the testimony of absent witnesses. The first is by the issue of letters rogatory. There is no instance on record of these having been issued as a matter of course, nor is the present an application for such. The second source is statutory; nor can this court receive any aid, save by implication from that source. The two acts of congress upon this subject, are those of 24th September, 1789, and 24th January, 1827. The former, after describing minutely the mode of taking depositions de bene esse, limits the execution of commissions to an American magistrate. The latter act (1827, 3 Stat. 197) is limited in its terms to the execution of commissions within the limits of the United States and their territories. It would be a strange state of things, that without any express legislation as to the mode and manner of issuing commissions, parties would have the right to consider the issue of a commission to take testimony abroad grantable of course, and the nomination of commissioners a mere ministerial act by the judge. The only source of power to which this court can look, is the 30th section of the judiciary act of 1789 (1 Stat. 73); and from it derive that power by implication. That section provides, "that nothing herein contained shall be construed to prevent any court of the United States from granting a dedimus potestatem to take depositions according to common usage when it may be necessary to prevent a failure or delay of justice." This act, like all laws made in derogation of the common law, should be strictly construed. No commission should be issued under it, unless necessary to prevent a failure or delay of justice, or in accordance with common usage. What is meant by common usage, when an application is made to a court of equity for a dedimus potestatem to authorize the taking of testimony abroad? It has been contended on this motion, that by the terms "common usage" in the statute of 1789, congress must have meant the practice of the courts of the states; and the case of Buddicum v. Kirk, 3 Cranch [7 U. S.] 293, has been cited to sustain this proposition. It is true that Conkling, in his treatise (page 421), states that the above case enunciates a proposition which he embodies in these words: "The circumstances under which a commission will be issued, and the mode of obtaining, executing, and returning it, in the several districts, depend upon the practice and laws of the respective states, and the rules of the several courts of the United States." If this text-writer intended to say that the rules of chancery, in relation to taking testimony abroad, were to be in accordance with the practice and laws of the different states, he asserts a doctrine totally indefensible. If such was his intention, his ingenuity has detected in that case what has escaped the sagacity of Mr. Justice Curtis; for the latter, in his head-notes (1 Curtis, Dec. 584), has failed to perceive, for he does not notice, any such doctrine. The case of Buddicum v. Kirk was a common-law case, and the question arose, whether service of a notice to take a deposition upon an attorney at law was equivalent to one upon an attorney

in fact? As the law of Virginia required the notice to be made on the attorney in fact, the court, very properly, under the 34th section of the judiciary act, adopted the law of the state in a common-law case. That case is no authority to sustain the proposition that the practice of this court acting as a court of equity, is to be controlled by the practice of the state courts, whatever that may be. It would make the chancery jurisdiction and practice of the federal courts subservient to the practice of the courts of every state in which the federal court might sit; whereas, it must be uniform in all the states. In Gaines v. Relf. 15 Pet. [40 U. S.] 9, this question is fully discussed, and even in Louisiana, where there is no equity state court, it was decided that chancery practice prevails in the circuit court of that state, and must prevail in accordance with the rules prescribed by the supreme court, and where they are silent, according to the practice of the high court of chancery.

The question then arises, whether an application to a court of equity to take testimony abroad is grantable of course, and all considerations of the materiality of the testimony invoked, and the purposes for which it is sought, are to be postponed until the testimony is offered as evidence? Authorities have been cited to sustain the position, that a party has a right to move to dissolve an injunction, and even to renew such motion. This is doubtless true; but the right to make any number of such motions does not alter the nature of the evidence proposed to be offered to sustain them, or fix the propriety of granting the application to take testimony abroad. These are to be controlled by the usages and rules of a court of chancery.

The proviso to the 30th section of the judiciary act of 1789 (1 Stat. 90) gives the power to issue a dedimus potestatem according to "common usage." When an application for such process is made to a court of equity, that common usage is to be ascertained by reference to the usages of chancery. One of the fundamental principles which control that court is, that as its object in compelling a discovery, or granting an application for a commission to take testimony abroad, is to enable itself, or some other court, to decide on a matter in dispute between the parties, the discovery or testimony sought must be material to the relief prayed for, or material to be used in some other suit actually instituted or proved to be capable of being instituted in another forum. If, therefore, the party does not show the testimony he seeks is material to enable him to support or defend a suit, he shows no title to what he seeks; and, consequently, if he seeks it by bill a demurrer will lie, if he seeks it by motion he is not entitled to it. Such is the doctrine enunciated by Lord Redesdale (Mitf. Ch. Pl. 192). It is illustrated by decided cases. Daniell in his treatise cites from the case of Shedden v. Baring, 3 Anstr. 880, to sustain the proposition that a bill for discovery or a commission to take testimony abroad must not only show that the action has been brought, but it must show that the facts relied on as to which evidence is sought are such as can be made use of, either in support of the action or in defense of it; otherwise, the bill will not lie. In England the usual mode is to apply by a bill for a discovery and a commission to take testimony abroad, or to take testimony abroad only. "A bill of this kind [says Daniell], for the mere purpose of examining witnesses abroad, is subject to nearly the same rules as bills for discovery in aid of an action at law." Daniell, Ch. Prac. 1096. There can be no stronger proof that an application to take testimony abroad is not matter of course, but is an application to the judicial discretion, than the fact that the ordinary course in England is to apply by bill in equity to obtain it. In Lousada v. Templar, 2 Russ. 561–564, Lord Eldon says "that though the circumstances were such that even if the plaintiff at law had obtained a verdict, he could not allow him to receive the money until it was ascertained what had been done in Peru, yet he would not grant commissions in aid of a defense to an action when he was not satisfied that the facts alleged as a defense would constitute a legal defense to the legal demand." "The court," he added, "ought never to grant a commission without examining strictly what is the state of the pleadings." It is evident from this statement of the lord chancellor, that when after his retirement from office he gave an opinion, as stated by Daniell, that the witnesses' names need not be inserted in the affidavit, he did not intimate they and the other facts were not necessarily made to appear in the pleadings and by other means. In the case of Martin v. Nicolls, 3 Sim. 458, there is a strong illustration of this doctrine. The principle asserted is. that a bill for discovery against a defendant, and a prayer for a commission to take the examination of witnesses, is demurrable. The facts in the case were, that a bill was filed alleging that a judgment had been obtained against complainant in Antigua, on which an action was pending in England against the complainant. It set forth certain facts to show the foreign judgment was void, prayed a discovery against the defendant, and stated that without proof of such facts the complainant could make no defense at law; it prayed also, that a commission might issue to take the testimony of witnesses at Antigua, and other places beyond sea. A demurrer was filed. The court after deciding (correctly or not is not the inquiry), that to the foreign judgment the facts if proved could not constitute a defense, for that reason sustained the demurrer. The chancel-

lor said, "If I were to allow this bill to stand, I should be in effect saying, that the judgment obtained in 'Antigua' may be overruled in the court of common pleas." In the language of the chancellor in that case, this court may say, that if they allow the present application, so far as the evidence as to title goes, that it is in effect to say it has the right to try title. Lord Eldon has said, as we have seen in Lousada v. Templar, 2 Russ. 561, the court ought never to grant a commission without strictly examining the pleadings. This is for the purpose of ascertaining the issue to be tried by the court, and the materiality of the testimony to try it. When we look at the pleadings in this case, we find the relief prayed for is the issue of an injunction to arrest the destruction of property until an adjudication of it has been made by the tribunals to which it has been confided by law. The whole structure of the bill assumes the ground, and upon it asks the relief prayed, that the district court has sole jurisdiction between the parties on the question of title, and that all the power of this court is limited to granting an injunction, and thus extending a relief not within the sphere of the district court. In the answer, a demurrer is incorporated, which assigns as one of its grounds, that it appears from the bill itself, that no other than the district court can entertain jurisdiction of said claim. It has been contended throughout, by the defendants, that this court could not adjudicate upon title, it being within the sole jurisdiction of the district court, and that circumstance assigned as a reason why this court could not entertain jurisdiction of this bill, which asks for the issue of an injunction. The court, by decreeing the relief prayed for, asserted jurisdiction over the injunction, although it disclaimed all power to decide title. They did so, upon the ground that a court of equity would provide for the safety of property in dispute, pending a litigation, and sustained the position by reference to the action of the English chancery in relation to the preservation of property in dispute in the ecclesiastical courts. Now, the pleadings in this case are not changed; the issue is the same; title is no more now in issue in this court than it was; the jurisdiction of this court over this case is in no ways altered, increased, or diminished.

Under these circumstances, application is made to obtain testimony from abroad which relates to the title of defendants, to be used on the trial of this cause, or upon a motion to dissolve the injunction which has been granted. It is the ordinary practice of a court of chancery to dissolve an injunction already issued, after answer filed; and there is no objection to the renewal of such motion upon new and material testimony which would be admissible as evidence on the issue pending between the parties. Indeed, such motion may arise on any new matter which may have arisen since the issuing of the injunction. For instance, the injunction issued in this case has been granted to preserve property, the title of which is pending in another court. This tribunal will watch the conduct of the parties, and continue or dissolve the injunction, as the justice of the case may demand. If the conduct of the complainant be such as to intimate a desire to delay or postpone the trial of the title, this court would, upon motion, dissolve the injunction and dismiss the bill. If, on the other hand, the conduct of the complainant be such as evinces a desire to go to prompt trial of the title, the injunction would be continued until the determination of the title by the courts to which it was confided by law. If that determination be in favor of defendants, a dissolution of the injunction would be decreed, and the bill dismissed. If in favor of complainant, it is unnecessary to prejudge the action of the court. But the result must be in one event. to decree a perpetual injunction; and in another, to dissolve the injunction, restoring the parties to their former relative position and respective rights, the court having accomplished its object—the preservation of the property pending the dispute. Whether a perpetual injunction be granted or the bill dismissed, the decree will be final on the only issue of which this court has jurisdiction.

Upon the ground, then, that the court has no jurisdiction to try title, and that it would be the assertion on its part of the right to do so if this application were granted; that the evidence as to title cannot be used in this court,—this tribunal in the exercise of the discretion reposed in it, as controlled by the usages and principles of a court of chancery, is constrained to deny the present motion. But there is another aspect in which this case must be viewed, and which must also control the discretion of the court. Whatever may be the legal effect of the adjudications of the tribunals to whom the question of title is confided by law, upon the rights of third parties, who have conflicting claims to the property disputed, and who were not parties to the proceedings in those tribunals, there can be little doubt, that, as between the claimants under the act of March 3, 1851 (9 Stat. 631), and the government of the United States, the provisions of that law cannot be disregarded by this court. By that act, congress prescribed the agencies, manner, and conditions on which the government consented to be sued, and through which, in which, and upon which they would surrender the legal title which had become vested in them by the treaty of Guadalupe Hidalgo, to such as established a better title, in accordance with the provisions of that law. By it, that body delegated to certain special tribunals the adjudication of title, and limited

the manner in which they were enabled to act, taking every precaution by the provisions of the law, to guard against fraud and imposture. The power of this court, as one of chancery, to grant injunction, and the application by the United States for such process, gives no additional jurisdiction to this court, nor confers power, beyond that which it has exercised as a court of equity, to preserve the substance of the property. To grant this application, would (to use the language of the chancellor, in Martin v. Nicolls, 3 Sim. 458, as we have seen) be in effect saying, that this court has jurisdiction to try title, and, consequently, to give relief if decided in favor of the defendants.

Was it within the power of congress to pass the act of 3d March, 1851, or is it in conflict with any clause in the constitution of the United States? In the case of West v. Cochran, 17 How. [58 U. S.] 415, the supreme court of the United States enunciate the following principles. "It was also competent for congress to provide, that before a title should be given to any one, the exact limits of his possession, and the title which the United States was to give, should be defined, and that this should be done by such agencies, and in such manner, as might be fixed by congress. This is in entire accordance with the provisions of the treaty, which guarantees to the inhabitants the rights of property secured to them; but it was not intended to provide for the particular modes and instrumentalities by which such rights should be ascertained and enforced,—these being left to the nation to whose powers they were confided; so that the question is, what has congress deemed expedient?"

Now, to ascertain what has been done in this case, we must look to the act of congress passed March 3, 1851 (9 Stat. 631), entitled "An act to ascertain and settle the private land claims in the state of California." By it, they have confined exclusively to certain tribunals, the adjudication of title, with specially delegated powers, and which, not being courts of general jurisdiction, can exercise none not expressly granted, or directly and necessarily derived by implication. So far from conferring authority upon them, to send process to a foreign country, to procure testimony, a power exercised by courts of general equity powers, as we have seen with great caution, congress have excluded a conclusion that any such power can exist, by enacting that "no deposition taken by or in behalf of any such claimant, shall be received in any case, whether before the commissioners, or before the district or supreme court of the United States, unless notice of the time and place of taking the same shall have been given in writing to said agent, or to the district-attorney of the proper district, so long before the time of taking the deposition, as to enable him to be present at the time and place of taking the same; and like notice shall be given of the time and place of taking any deposition on the part of the United States." The introduction of this clause into the act, is a clear expression of the determination of congress, when they gave their consent that the government should be sued, that her rights were not to be affected by any deposition or testimony in writing, save such as had been taken in the presence of their agent, or of the district-attorney of the proper district. Now, that clause in the law may have been "gross injustice" or "oppression," and a refusal on the part of the present administration to amend the law, may be an "iniquitous attempt to suppress the means of truth," as zealously urged by one of the solicitors of those who are making this application. Congress may, however, have been impelled by what they deemed legitimate and prudent precaution to shield the rights of the government from the dangers of testimony taken in a foreign country, among a people who had just ceased to be avowed enemies of this country, without the checks and sanctions thrown around the proceeding by the presence of the agent of this government, and by the execution of the commission before an American functionary. The present administration may have been actuated by the same motives in refusing to amend the said act, as has been urged.

The general rule is, however, "that if the motive and design of an act may be traced to an honest and legitimate source, equally as to a corrupt one, the former ought to be preferred." Arredondo's Case, 6 Pet. [31 U. S.] 716. But with the motives of the government which passed the law, or the present administration which, it is urged, has declined to aid in its repeal, this court has nothing to do. Such legislation, if it be as represented, does not conflict with the constitution of the United States; and the highest tribunal in our country has decided that it is competent for congress to regulate the manner and agencies by which the title of claimants to lands shall be ascertained, and that such legislation does not violate any rights intended to be secured by the treaty. The conclusions to which the court has come, are:

1st. That an application for the appointment of commissioners to take testimony abroad is not grantable of course; but it is addressed to the judicial discretion which is controlled by the usages and rules of chancery practice, in accordance with which the present motion cannot be granted.

2d. The act of 3d March, 1851 (9 Stat. c. 31), cannot be disregarded; and this court ought not to violate the spirit and policy of that act, by granting its process to take testimony abroad, to be used in the trial of title in this cause.

The motion, therefore, must be denied.